**STATE of Missouri, Plaintiff–Respondent,**

v.

**Randall Gene TIDLUND, Defendant–Appellant.**

**No. 22467.**

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 29, 1999.

Motion for Rehearing and Transfer Denied Oct. 20, 1999.

Application for Transfer Denied Nov. 23, 1999.

Craig A. Johnston, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Karen L. Kramer, Asst. Atty. Gen., Jefferson City, for respondent.

KENNETH W. SHRUM, Judge.

A jury convicted Randall Gene Tidlund (Defendant) of two counts of stealing by deceit, § 570.030.[1] Defendant appeals, claiming there was not sufficient evidence to convict him on either count. We disagree. We affirm.

## STANDARD OF REVIEW

■ In a "stealing by deceit" case, as in most criminal cases, we consider the evidence and the inferences drawn therefrom in the light most favorable to the verdicts and reject all contrary evidence and inferences. *State v. Basham,* 568 S.W.2d 518, 520 (Mo.banc 1978); *State v. McMellen,* 872 S.W.2d 508, 509 (Mo.App. 1994). Our review is limited to determining whether "there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Dulany,* 781 S.W.2d 52, 55[3] (Mo.banc 1989).

■ A jury may believe all, some, or none of the witnesses' testimony, and the jury must resolve any conflicts or contradictions in witness testimony. *State v. Sielfleisch,* 884 S.W.2d 422, 427[2] (Mo. App.1994). "We neither weigh the evidence nor determine its reliability or the witnesses'[ ] credibility." *McMellen,* 872 S.W.2d at 509–510.

## STATUTORY PROVISIONS

Section 570.030 provides: "A person commits the crime of stealing if he appropriates property or services of another with the purpose to deprive him thereof, either without his consent or by means of deceit or coercion." Section 570.010(6), RSMo 1994, defines "deceit" as:

"[P]urposely making a representation which is false and which the actor does not believe to be true and upon which the victim relies, as to a matter of fact, law, value, intention or other state of mind.... Deception as to the actor's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise[.]"

## FACTS

In the summer of 1997, Defendant owned and operated a business called Nationwide Auto Connection (Nationwide) in Springfield, Missouri. Nationwide was primarily engaged in the business of selling consigned automobiles, although it also sold and installed auto glass, did auto body work and detailing, and "different things connected with the repairs of automobiles." As to Nationwide's consignment business, Defendant's general practice was to contact people who were offering vehicles for sale and ask them to place their vehicles on Nationwide's lot where Defendant would show and try to sell them. Defendant charged a monthly lot fee for each consigned vehicle and collected a commission when he made a sale. Defendant found most of his consignment customers

---

1. All statutory references are to RSMo Cum. Supp.1996 unless otherwise indicated.

by calling persons who offered their vehicles for sale in circular advertisements.

The State charged Defendant with four counts of stealing by deceit when he collected advance payments for repairs on certain consigned vehicles but never made the promised repairs and never refunded the money. As part of its case, the State presented evidence that when Defendant agreed to repair the subject vehicles, he was not licensed by the City of Springfield to operate a motor vehicle repair business.

At the close of the State's case, Defendant moved to dismiss all counts. The trial court denied Defendant's motion as to Counts I and III but sustained it as to Counts II and IV.[2] The following is a recital of the evidence most favorable to the State regarding each count.

*Victim Alora Chace (Counts I & II: Pickup Truck)*

In July 1997, Alora Chace (Chace) advertised a car for sale in a local circular. When Defendant saw the ad, he called Chace and offered to sell her car on consignment. After talking to Defendant, Chace agreed to consign not only the car, but also her 1988 Chevrolet S–10 pickup truck.

On or about August 16, 1997, Chace called Defendant to inquire about her vehicles. During this call, Defendant suggested to Chace she should have some work done on the S–10 pickup truck to make it more marketable. Defendant told Chace that for $645, he would paint and stripe the truck, remove dents, install a used grill, and replace a damaged "dash cap." Defendant asked for the money "in advance." Chace agreed and gave Defendant a check for $645 to make the repairs.[3]

When Chace next contacted Defendant about her truck, he told her he "hadn't had time to work on it yet." Defendant told Chace he "had a shop in his garage" at home but "was in the process of moving it to a business place." He promised that "as soon as he could get his shop set [up], he would do it." While they talked, Defendant asked Chace about reupholstering the truck's seat. Defendant told Chace he would pull the seat out while he made the other repairs to the truck and have a friend do the reupholstery work. Chace agreed and gave Defendant a check for $150 to have the reupholstering done.[4]

In early September 1997, Chace continually called Defendant to inquire about her car because the insurance was nearing expiration. Eventually, Defendant told Chace that a "girl who took it out hadn't brought it back." When Chace inquired again the next day, Defendant told her the car still had not been returned. Thereon, Chace insisted Defendant report the car stolen. This incident prompted Chace to call Defendant "two or three days" later to tell him she wanted to retrieve her truck and wanted him to refund the repair money she had advanced. Defendant urged Chace to "leave it with him [as] he thought he could have it done over the weekend." Chace refused and retrieved her truck from Defendant on September 11, 1997.

When Chace retrieved the truck, she again asked for a refund. Defendant told her he did not have enough money to give her a full refund and could only pay her back in installments. Chace declined, saying she wanted her money refunded in full. Although she called Defendant "several times" about the money, Defendant never gave her a refund.

---

**2.** Count II alleged that Defendant obtained $150 from Alora Chace on the representation that *he* would reupholster her truck seats. Count IV alleged that Defendant obtained money from Sherry Potochnik for repairs *he* would make. In dismissing these counts, the trial court noted that the State's evidence showed that Defendant represented he had

*friends* who would make the repairs described in Counts II and IV.

**3.** Chace's $645 payment was the subject of Count I.

**4.** Chace's $150 payment was the subject of Count II.

Each of Chace's repair checks named Defendant—not Nationwide—as payee. Moreover, each check was cashed by Defendant. At trial, Defendant was unable to account for what he did with the money. He admitted he never bought the parts or materials necessary to repair Chace's truck, never made any of the promised repairs, and never had the upholstery work done.

*Victims Harold & Brenda Barclay (Count III):*

In August 1997, Harold Barclay and his son owned a 1985 Toyota pickup that they wanted to sell. Harold's wife, Brenda, advertised the truck for sale in a local Springfield newspaper and circular. On August 14, 1997, Defendant called the Barclays and persuaded them to consign the vehicle to Nationwide to sell. At the time, Harold Barclay told Defendant the motor in the truck was "shot" and would hardly run.

On September 3, 1997, Defendant called Brenda Barclay to suggest that the truck might run better, and, as a result, sell more readily, if the Barclays had the truck's distributor and spark plugs replaced. Defendant told Mrs. Barclay he would replace those items for $150. After checking to see if the Defendant's price was reasonable, the Barclays agreed to let Defendant make the repairs. They gave him a $150 check as advance payment for the repairs.

During the week of September 22, Brenda Barclay called Defendant and asked if there had been any activity on the truck. Defendant answered, "Yes, it was running better," told her that he had "replaced the distributor and spark plugs," and stated that he "had several people interested in it." The week of September 29, Mrs. Barclay again called Defendant to ask about "activity" with the truck. She also asked where the truck was located. Defendant told her the truck was at his brother's lot because there was more traffic at that location.

On September 29, 1997, Detective Ronnie Long of the Springfield police department contacted the Barclays about their truck. Long had observed one of the license plates from the Barclays' Toyota on a different truck parked on Defendant's lot. As Long talked with the Barclays, he learned of their advance payment to Defendant for repairs. Long then asked the Barclays' permission to test drive their truck to see if Defendant had made the promised repairs. The Barclays agreed. Thereon, a highway patrol investigator ("Laub") went to Defendant's lot posing as a customer. Laub took the Barclays' truck for a test drive and had it inspected by a highway patrol mechanic. Laub testified that the truck "did not run very well," was not "real smooth," and did not "have very good power." The highway patrol mechanic who inspected the Barclays' truck testified in detail about his inspection and concluded that the plugs, plug wires, and distributor had not been replaced in the Barclays' truck.

On October 3, 1997, the Barclays asked Defendant to return their Toyota. However, Defendant told them he had "somebody really interested" and persuaded them to leave it overnight. The next day, when no sale materialized, the Barclays went to Nationwide to retrieve their truck. They saw that the rear license plate was missing from the truck and asked Defendant where it was. Defendant answered, "It must have been taken off when someone was . . . cleaning it up."

At trial, Defendant conceded that he cashed the Barclays' $150 check and that he did not use the money to buy spark plugs or a distributor for their truck, and he testified that he had no recollection what he did with their $150.

*Victim Sherry Potochnik (Count IV)*

In early September 1997, Sherry Potochnik was trying to sell a 1992 Plymouth Sundance via an advertisement in a local circular. At the time, the car had a damaged front bumper. After seeing Potochnik's ad, Defendant contacted her and

proposed a consignment arrangement. Potochnik agreed to put her car on Defendant's lot but explained that she needed to sell quickly because she had another car and was making two payments and could not afford to continue doing so. She also told Defendant that she still owed $2,700 on the Plymouth and that it had to bring that amount plus his fees.

On September 19, 1997, Potochnik called Defendant about her car. Defendant told her that people had been looking at the car, but "they didn't like the bumper." He then commented that "if we could get the bumper fixed, [the car] would sell." Potochnik asked what it would cost to fix the bumper. Defendant answered that "he had some friends that he could get to fix it [for] around $250." In response, Potochnik told Defendant that she did not have the money, that all she did have was a child support check she had received that day, and that she did not want to spend that money. Defendant assured Potochnik that "we'll get you that money back when we sell the car." Potochnik finally agreed and wrote out two checks, each of them for $125. At Defendant's suggestion, Potochnik did not name a payee on the checks. Defendant explained that he had different people to do the work. After receiving Potochnik's checks, Defendant filled in the payee lines on both checks with his own name, cashed one, and gave the other to an employee, Marvin Bontrager.

On Monday, September 23, Potochnik called Defendant to inquire about the progress on the repair work. Defendant said he had not made the repairs but that he would take the car to his garage and complete the work by Wednesday of the same week. On Wednesday, Potochnik again called Defendant. He told her he had started the work on her car but "was having trouble getting his garage set up." Defendant said that when that was done, "he'd be able to finish the car."

On September 29, 1997, Potochnik asked Defendant to return her Plymouth. Defendant told her, "It was not in running condition. It could not be [driven]." He explained that "the bumper was all in parts." Defendant assured Potochnik she could get her car on Friday, October 3. Potochnik decided to check for herself what progress Defendant had made on her car. Within twenty or thirty minutes of her conversation with Defendant, she and a friend drove to Defendant's garage. No one was present, so her friend looked through the windows of the garage. Based on what Potochnik learned from this incident, she testified that nothing had been done. The original parts were still on the Plymouth, and it looked the same as when she delivered it to Defendant. Potochnik's testimony on this subject was corroborated by Detective Long. On September 28 and October 3, Long went to Defendant's garage and looked through the garage windows. Each time, Long saw Potochnik's car in its damaged condition and saw nothing to indicate that repair work had been commenced.

Defendant called Potochnik at approximately 8:00 a.m. on October 3, and asked her to postpone picking up the car. He told her that "it was still in parts and . . . he needed some more time to work on it" and "if she came to get it, it would not be running." Potochnik told Defendant she would give him until 9:30 a.m., at which time she would be there to get the car. When Potochnik went to Defendant's garage at 9:30 a.m., she found that the car's fender had been "sanded a little bit" and there was "wet putty" around the edges of the fender, but the car had not been repaired as agreed. After retrieving her car, Potochnik asked Defendant to refund her $250. He told her he did not have the money and asked her to wait a couple of weeks until he got back on his feet. Defendant never repaid Potochnik the $250.

## DISCUSSION AND ANALYSIS

*Point I: Sufficiency of Evidence (Count I, Chace as Victim)*

Defendant's first point maintains that the State did not produce sufficient evi-

dence to prove that (1) he got money from Chace with the intent to deprive her thereof, (2) the appropriation was accomplished by deceit, or (3) he had the necessary criminal intent. Defendant contends that although he had not repaired Chace's truck when she demanded its return, deception cannot be inferred from the fact that he had not yet performed the promise. Moreover, Defendant insists that his motion for judgment of acquittal should have been sustained based on Chace's testimony that she refused his offer "to make repairs that weekend or refund all of her money, albeit in payments."

■ To make a submissible case under § 570.030, the State must show that the defendant had the intent to cheat or defraud at the time he made the false representation to cause the victim to part with his or her money. *Sielfleisch*, 884 S.W.2d at 428[6]. "Otherwise, there is no element of deceit or fraud, and the defendant [upon non-performance] would be guilty of no more than breach of contract, not subject to criminal sanction." *Id.* at 428.

■ However, the subjective intent of an accused at the time of making his or her promise is rarely open to direct proof; consequently, the State can show intent by the use of circumstantial evidence. *Id.* at 428[7]; *McMellen*, 872 S.W.2d at 510[1]. In particular, the State may present evidence of similar incidents where the accused consistently made the same or similar promises. *Sielfleisch*, 884 S.W.2d at 428[7]. As explained in *State v. Basham*, 571 S.W.2d 130 (Mo.App.1978):

"The theory which underlies admission of such evidence is that if a defendant consistently makes the same promise to a number of victims, and, after obtaining the victim's money, consistently fails to perform, it may be fairly inferred from the pattern of behavior that no mischance could reasonably explain all the failures of performance. Thus, a strong presumption exists that the defendant must have intended not to perform in any instance and particularly in the situation in which he has been charged. Before this evidentiary strategy may be used, however, it is essential that the behavioral attributes of the other activities be unequivocal and sufficiently similar to the offense charged."

*Id.* at 132[3].

■ We find the jury's conclusion that Defendant intended to deceive Chace at the time Chace gave him $645 to repair her truck was supported by sufficient evidence. Defendant told Chace the proposed repairs would help sell the truck, that he would do the work in his garage at home, and estimated it would be done in a week. However, Defendant never performed the promised repairs on the truck, never bought any parts or materials needed for the repairs, never returned Chace's money, and could not account for what he did with the money.

Further, Defendant was not licensed to do auto repairs at the time he took Chace's money. He claimed not to need such a license as he was not holding Nationwide out as a repair shop and the repairs he proposed for Chace's truck were merely incidental to the consignment agreement. Even so, Chace's repair check was made payable to Defendant, individually, not to Nationwide. Moreover, when Chace repeatedly asked Defendant about her truck during late August and early September, his excuse for not having made the repairs was that he was moving his repair shop from his home to a "business" site and was not yet set up at the new location. There was also evidence from which the jury could have inferred that Defendant only needed two days to repair Chace's truck since he offered to make the repairs during a single weekend. Nevertheless, nearly thirty days after he was paid, he still had not completed any repairs.

There is also strong circumstantial evidence that Defendant intended to cheat and defraud Chace at the time he got her money in the evidence that Defendant made the same representations and prom-

ises to other victims and, after obtaining the victims' money, consistently failed to perform the promised services. For instance, Defendant approached the Barclays and Potochnik about repairing their vehicles to help sell them but did so *only after* the owners consigned the vehicles to him and he had taken possession of them. Just as he had with Chace, Defendant insisted that the Barclays and Potochnik pay him in advance for promised repairs. After receiving their advance payments, Defendant never made any repairs to the Barclays' vehicle and only made token repairs to Potochnik's vehicle. In the Barclays' case, Defendant led them to believe he had replaced the distributor and spark plugs in their truck, which was untrue. As to the proposed upholstery repair for Chace and the repairs to Potochnik's car, Defendant told the victims he would get someone else to do the work. Even so, Defendant was named as payee on the checks, he cashed Chace's upholstery repair check and one of Potochnik's checks, he kept their money without making the repairs as promised, and he never refunded any portion thereof.

As was true with Chace, each time the Barclays or Potochnik inquired about the progress of the promised repairs, Defendant would stall them by offering various explanations as to why the repairs had not been made or by misleading them about the condition of their vehicles. As with Chace, Defendant's request to the Barclays and Potochnik for advance payment came when he admittedly needed money to finance the move of his auto repair business from his garage at home to his new shop. We find that evidence of Defendant's actions toward these other victims established a pattern of behavior from which the jury could have reasonably inferred that "no mischance could reasonably explain all the failures of performance" and, therefore, a "strong presumption exists that [Defendant] must have intended not to perform in any instance and particularly" when he promised

to repair Chace's truck. *See Basham,* 571 S.W.2d at 132.

Defendant characterizes *State v. Morris,* 699 S.W.2d 33 (Mo.App.1985), as an analogous case and authority for finding there was not sufficient evidence in this case to show the requisite criminal intent. In *Morris,* the complaining witness, Soldani, called Morris and described what he thought was wrong with the transmission in a truck he had recently purchased. Soldani then took the truck to Morris's garage and Morris, after he drove the truck, gave Soldani his opinion of what was wrong and what repairs were needed. Morris repaired the transmission and Soldani paid for the repairs. However, the work was unsatisfactory and Soldani complained. Morris agreed to replace the transmission. Soldani, who had some automotive experience, later examined the "replacement" transmission and concluded that no work had been performed. He claimed the truck was no better than when he took it to Morris's garage. He called and confronted Morris, who offered to replace the transmission or give Soldani his money back. A jury convicted Morris of stealing by deceit, but the Western District reversed, finding that the State had failed to prove the element of criminal intent. *Id.* at 36.

*Morris* is factually distinguishable from this case. Morris did not solicit repairs after having the vehicle in his possession on consignment; rather, Soldani asked Morris to check the transmission of his vehicle. Repairs were actually performed in *Morris.* Soldani was dissatisfied but refused to allow Morris to perform under the ninety-day warranty. In *Morris,* there was no payment up front for services *never* rendered, as occurred here. Significantly, in *Morris,* there was no evidence that Morris consistently made the same or similar promises and then failed to perform. *Morris* does not support Defendant's argument.

We conclude that the trial court did not err in overruling Defendant's motion for

acquittal because the circumstantial evidence adduced at trial was sufficient to establish Defendant's intent to deceive. Point I is denied.

*Point II: Sufficiency of Evidence (Count III, Barclay Victims)*

Defendant's second point maintains there was insufficient evidence to prove he appropriated the Barclays' money "with the intent to deprive, that the appropriation was accomplished by deceit, or that he had the necessary criminal intent." Defendant concedes that he "had not yet replaced the distributor or spark plugs in the Barclays' truck when they secretly removed their truck from [Defendant's] car lot without his knowledge," but he reprises his Point I argument that "deception cannot be inferred from the fact that he had not yet performed the promise." Further, Defendant argues that

> "[e]ven though there was evidence that ... [Defendant] told Ms. Barclay that the replacements had been made when they had not, those alleged statements were made over two weeks *after* he had been paid (the date of the charged crime) and *prior* to the return of the truck. And, since the Barclays took the truck *without [Defendant's] knowledge*, he was not given the opportunity to finish the needed repairs or else refund the money."

The evidence supporting the jury's conclusion that Defendant intended to deceive the Barclays at the time he obtained their payment of $150 is virtually identical to the evidence we found sufficient to sustain Defendant's conviction under Count I. Defendant took the Barclays' $150 and admittedly never bought parts or made the repairs as promised, yet he never repaid the Barclays and could not account for what he did with the money. When Brenda Barclay asked about the repairs, Defendant assured her the distributor and spark plugs had been replaced as agreed. Defendant testified that his car lot manager, Marvin Bontrager, repaired the Barclays' truck, and Bontrager said that he did clean

and check the "spacing" or gaps on the truck's spark plugs. Bontrager admitted, however, that Defendant never told him to replace the truck's spark plugs or distributor. Moreover, the highway patrol mechanic who inspected the Barclays' truck testified that, in his opinion, the spark plugs had not been removed and were "burned beyond use." Defendant was not licensed to perform vehicle repairs and claimed he did not need a license to repair consigned vehicles, but the Barclays' check was made payable to Defendant, individually, not to Nationwide. When the Barclays told Defendant they wanted their truck back, Defendant persuaded them to leave it overnight as he had "somebody really interested." Defendant admitted that he had not made the repairs as agreed and that he had not put new plugs and a new distributor in their truck, saying, "[a]fter we got to working on it, it didn't need it." Yet, he also admitted he never explained that to the Barclays and, in fact, told Mrs. Barclay that "the truck had ... been repaired and [was] running better." From these facts, the jury reasonably could have inferred that Defendant's insistence on keeping the Barclays' truck overnight for the ostensible purpose of selling it was merely part of a scheme to obtain money from consignors to repair their vehicles, pocket the repair money without making the repairs, and then sell the vehicles in an unrepaired state without the consignors' knowledge.

Also, as discussed above, this jury did not have to consider the Barclays' case in isolation. The jury was free to consider the facts surrounding Defendant's dealings with Chace and Potochnik. This follows because those incidents were similar to the Barclays' case in that Defendant consistently made the same or similar promises whereby he obtained the victims' money and then never performed his promises. *See Sielfleisch*, 884 S.W.2d at 428[7].

Defendant's argument that there was insufficient evidence to support his conviction because the Barclays picked up their

truck and thus prevented him from making the repairs or refunding the money simply ignores the large body of circumstantial evidence outlined above from which the jury could have inferred that Defendant *never* intended to do what he promised. We find there is sufficient evidence to support the conclusion that Defendant had the requisite intent to deceive. Point II is denied.

The judgment and sentence of the trial court are affirmed.

CROW, P.J., and PARRISH, J.,concur.